STATE RIGHTS. The (RALSTON v.). See Case No. 11,540.

STATON (UNITED STATES v.). See Case No. 16,382.

STEACY (ATKINS v.). See Case No. 605.

## Case No. 13,329.

### STEACY v. LITTLE ROCK & FT. S. R. CO. et al.

[5 Dill. 348.] [1]

Circuit Court, E. D. Arkansas.    1879.

RAILROAD COMPANIES — CHARTER — CONSTRUCTION CONTRACT — LIABILITY OF TRANSFEREE OF STOCK PURPORTING TO BE FULL-PAID WHEN NOT FULL-PAID — RELEASE OF SUBSCRIBER TO STOCK — DOUBLE LIABILITY OF STOCKHOLDER.

1. Where, under its charter, the directors of a railroad company issued shares of stock to a contractor for building its road as full-paid shares (which contract was never questioned by

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

shareholders or by creditors as being either fraudulent or ultra vires), and such shares were sold by the contractor, in the public market, as full-paid shares, to purchasers for value, without actual notice of the equities between the contractor and the company, the holders of such shares are not subject to such equities, or liable to have the shares thus issued and thus purchased treated as unpaid shares.

[Cited in Rood v. Whorton, 67 Fed. 437.]

[Cited in Hill v. Silvey, 81 Ga. 500, 8 S. E. 810; Young v. Erie Iron Co., 65 Mich. 126, 31 N. W. 822; Clayton v. Ore Knob Co., 109 N. C. 385, 14 S. E. 39.]

2. The agreement of the company, sanctioned by the stockholders, made when the company was solvent, and acquiesced in and acted on for seven years, to release certain counties from the payment of the balance of their stock subscriptions, was, under the circumstances, held valid.

3. The charter of the Little Rock and Fort Smith Railroad Company provided that no stockholder therein should be liable for losses to any greater amount than the whole amount of stock subscribed for or taken by him, and that the charter should not be altered or amended except by the consent of the majority of the stockholders. Subsequently the constitution of the state provided for a double liability on the part of all stockholders in corporation; but the provisions of the constitution were never accepted by the stockholders: *Held,* that the measure of liability of the stockholders, at whatever time they became such, is that fixed by the charter, and was not increased by any subsequent act of the state not assented to by the corporation.

4. Whether the constitutional provision was self-executing, quære?

The bill of complaint of John G. Steacy sets forth, among other matters, that Steacy, as the surviving partner of the firm of Peirce, Steacy & Yorston, on or about the 31st day of August, 1875, instituted a suit in the state circuit court of Pulaski county, against said railroad company, for the recovery of judgment for the sums due said firm and assumed by said company; and that the said Steacy, on or about the 8th day of December, 1875, recovered judgment against said company in said suit, for the sum of $1,041,181.70, which remains and is a valid and subsisting judgment, binding against said company and the stockholders therein. The bill of complaint of Steacy then sets forth that he, as such surviving partner of said firm of Peirce, Steacy & Yorston, on the 13th day of January, 1874, instituted another suit against said company, in which, by the consent of its attorney, he recovered judgment in said state court against said company, on the 19th day of March, 1874, for the sum of $5,510.02. Steacy avers that he has caused execution to issue on each of said judgments, and placed the same in the hands of the sheriff of Pulaski county, who has returned nulla bona on the same; that said company has ceased to do business, is utterly worthless and insolvent, and has no property or effects whatever upon which to levy said executions. That the defendants [Elisha Atkins, J. H. Converse, Conway, Pope, Johnson, and Crawford counties and others] are stockholders in said company, the said Atkins owning ten thousand shares, of $25 each,

of unpaid stock, and the said Converse nine hundred and sixty shares of unpaid stock; that the stock held by said defendants was issued by said corporation subsequent to the adoption of the constitution of said state, which went into effect in April, 1868; that said constitution contained the following provision, viz.: "Dues from corporations shall be secured by such individual liability of the stockholders and other means as may be prescribed by law; but, in all cases, each stockholder shall be liable, over and above the stock by him or her owned, and any amount unpaid thereon, to a further sum at least equal in amount to such stock." That the defendants respectively are liable to the said Steacy to the amount of stock owned by them, and each of them, in said corporation, and, in addition thereto, in an amount equal to the stock owned by each of said defendants respectively. The prayer for relief of said original bill of complaint is that the plaintiff may "have a decree against said defendants to the extent of their double liability upon the foregoing stock, if need be, or, if a less sum will be sufficient to satisfy his demands, that they, each of them, be required to pay such proportion thereof as they are respectively liable for," and for general relief.

The bill of complaint of the said Cornelius Hurley alleges, in substance, that on the 9th day of January, 1872, he recovered judgment in the said circuit court of Pulaski county, against said railroad company, for the sum of $7,981.05, which judgment is, in all respects, a valid and subsisting judgment against said company and its stockholders, and that the same has not, in whole or in part, been paid or satisfied. That on the 19th day of April, 1876, said Hurley caused execution to issue on said judgment, and placed the same, on said day, in the hands of the sheriff of said Pulaski county, who, on the 24th day of April, made a return thereon of nulla bona. That said railroad company, regularly and in due form, executed two deeds of trust, the former December 22d, 1869, and the latter June 20th, 1870, conveying to certain trustees all its property, real and personal, and all the franchises which could be conveyed by said company, to secure its bonds, amounting, in the aggregate, to $8,500,000. That afterwards suits were instituted in this court for the purpose of foreclosing said deeds of trust, and such proceedings were had; that all the property of said company, and all its franchises which could be sold, were sold under and by virtue of decrees rendered in said suits, on the 6th day of November, 1874, in consequence of which said decrees and sales said company became and is hopelessly insolvent. That on January 1st, 1869, and at other times between said day and January 1st, 1872, said Atkins and Converse subscribed to the capital stock of said railroad company, viz., the said Atkins for ten thousand shares of $25 each, and the said Converse for nine hundred and sixty shares of $25 each, by virtue of which said

subscriptions the said Atkins became indebted to said company in the sum of $250,000, and the said Converse in the sum of $24,000. That neither the said Atkins nor the said Converse ever paid to said company the whole or any part of said sums of money owing from them respectively; that the same is still due and owing to said company, and that said company is taking no steps and making no efforts to collect said sums of money. That said sums of money due and owing from said several defendants are charged and subject in equity to the payment of the plaintiff's judgment, and that the defendants are liable to him for the amounts so due and owing by them respectively. Complainant prays that said amounts, or so much thereof as may be necessary, be subjected to the payment of his said judgment, and that he have judgment against the said Atkins and Converse for the said respective sums of money due and owing by them to said company. The bill of complaint of the said Hurley also sets forth allegations similar to those contained in the bill of complaint of the said Steacy, relating to the liability of the said Atkins and Converse under the aforesaid provision of the constitution of the state of Arkansas, which went into effect in April, 1868. The prayer for relief is that the said Hurley may "have a decree for the amount due by said defendants respectively for unpaid stock as aforesaid, and also, if the same be necessary, for the amounts for which said defendants are individually liable, respectively, as aforesaid, or so much thereof as may be sufficient to pay and satisfy complainant's said judgment," and for general relief.

These defendants demurred to the bill of the said Hurley, assigning as cause for demurrer multifariousness, or a misjoinder of causes of suit; but said demurrer was overruled. Before said suits were consolidated, each of said plaintiffs amended his bill of complaint by changing the same into a creditor's bill, and by alleging that the capital stock of said defendant corporation is $6,000,000, divided into shares of $25 each; that said stock is distributed among a very large number of stockholders, most of whom are non-residents of this state, and not within the jurisdiction of this court. Several persons, resident in said state, are made defendants to said bills of complaint, and reasons are given why certain other persons whose names are set forth in said amended bills are not joined as defendants.

The prayer for relief in each bill is "that the aforesaid stockholders may be ordered and decreed to pay to the plaintiff the amount due him as aforesaid, as fixed and determined by the judgments aforesaid, with interest from the date of each judgment respectively, and to pay such other creditors of said corporation as may become parties to this proceeding such sums as may be found due to said creditors, and that the amount of the debts due as aforesaid to the plaintiff from said Little Rock and Fort Smith Railroad Company, and such as may be found due to such other creditors as may become parties hereto, may be adjudged against said stockholders as law and equity may require; and that the plaintiff may have such orders, decrees, and process as may be necessary to enforce the payment of such sums as may be adjudged against said stockholders, either for unpaid stock or upon their individual liability as stockholders under the constitution of 1868 of the state of Arkansas," and for general relief.

The answers of Atkins and Converse deny the validity of the plaintiffs' judgments, and insist that the railroad company was dissolved December 19th, 1874, before the large judgment of Steacy was recovered. The answer of the defendant Atkins then proceeds to deny that he owns ten thousand shares, of $25 each, of the capital stock of said railroad company: but he admits that, as an individual, on July 30th, 1870, he owned two thousand shares of said stock; April 13th, 1871, three hundred and sixty additional shares; May 31st, 1871, two hundred and eighty additional shares; and October 12th, 1871, thirteen hundred and sixty additional shares, all of the par value of $25 each, and amounting, in the aggregate, to four thousand shares of said stock. The defendant Converse, in said answer, denies that he owns, or ever has owned, nine hundred and sixty shares, or any other shares, of the stock of said company; but says that on the 10th of October, 1870, he purchased, with moneys furnished him by other persons, and solely as agent for said persons, among other things, sixteen hundred shares of the stock of said company; that said shares were, by accident or mistake, transferred to him on the books of said company, instead of to said other persons, but that he had no interest whatever in said shares, and simply held the title to the same as the agent or trustee of the several persons for whom he bought the same, and that, within a few days thereafter, he transferred and conveyed to said several persons the aforesaid identical sixteen hundred shares to which they were severally entitled, and that he never owned any shares of the stock of said company, except as above stated. The answers of said defendants deny that they, or either of them, ever subscribed to the capital stock of said company, and deny that said shares of stock by them severally owned or held, as aforesad, were unpaid stock, and that any subscriptions are due and payable upon the same, or ever have been since said defendants severally became the holders or owners of said shares of stock. They aver that in and by section 17 of the act of incorporation of said company, among the powers specifically conferred upon the president and directors of said corporation, was the power "to contract specially for work, labor, or materials to be furnished to the company, and agree whether the whole or any part thereof shall be payable in the capital stock of said company;" and in and by

section 29 of said act of incorporation it was enacted as follows, viz.: "The president and directors may, if they consider it expedient, receive subscriptions for stock, payable in labor or materials in and for the road, to be done and furnished under the superintendence of the directors of said company, or officers appointed by them, bond being taken to the company, with security, for the faithful performance of the work and furnishing of the materials. · No director, treasurer, engineer, clerk, servant, or other officer of the company shall be an undertaker or contractor of or for any work of said road." That, in pursuance of the aforesaid powers conferred by sections 17 and 29, the president and directors of said company, in the year 1869, entered into a written contract with the said Warren Fisher, Jr., the said Fisher, Jr., not being then or thereafter a director, treasurer, engineer, clerk, servant, or other officer of said company, in and by which said contract the said company, among other things, agreed to issue and deliver to the said Fisher, Jr., among other things, all the capital stock of said company, with certain exceptions specified in said contract, in payment for labor done and materials furnished in and upon the construction and equipments of the railroad of said company, the same to be done or furnished under the superintendence of an officer of said company, appointed by said directors; that the said several shares of the stock of said company which said defendants severally owned or held were originally issued and delivered by the said company to the said Fisher, Jr., under and in pursuance of the stipulations and agreements contained in said contract between said Fisher, Jr., and said company, and in payment for work done and materials furnished under said contract, and in and upon the construction and equipment of said railroad; and said several shares of stock were issued as, and were, and became thereby and by reason thereof, and are, full-paid shares of stock, and not subject or liable to any calls or assessments whatsoever, either by the directors or stockholders of said company, or any creditors thereof.

As a further defence to so much and such parts of said bills of complaint as seek to hold said defendants liable to pay the whole or any part of the said alleged judgments of the said Steacy and Hurley, by reason of alleged unpaid subscriptions due upon the several shares of stock by said defendants owned or held, said defendants, in their said answers, plead the laches of the said Steacy and Hurley and the statute of limitations of the state of Arkansas. The answers of said defendants deny that any liability was created or imposed upon stockholders in corporations, or upon these defendants, by the aforesaid provision of the constitution of 1868 of the state of Arkansas.

As a further defence to so much and such parts of said bills of complaint as seek to charge said defendants by reason of said constitutional provision of the state of Arkansas, defendants, in their answers, allege: (1) That, in and by section 25 of the act of incorporation of said company, all its stockholders are specially exempted from all responsibility for the debts of said company beyond the amount of their subscriptions, and that said provision of the constitution of said state is void, as impairing the obligation of contracts. (2) That the remedy supposed to have been created by said constitutional provision is barred by the statute of limitations of said state of Arkansas.

After the answers of said defendants had been filed, and after judgment had been rendered upon certain pleas in bar filed by another defendant, which set up the aforesaid special matters of defence, the said plaintiffs filed a second amended bill of complaint, in which they join other persons as defendants to said original and amended bills of complaint, and aver that they have made defendants all of the stockholders of said corporation who are known to said plaintiffs, and who are within the jurisdiction of this court, and solvent, and that the remaining stockholders are either insolvent or beyond the jurisdiction of this court.

The plaintiffs further allege, in said second amended bill of complaint, that these defendants, the said Atkins and Converse, "are setting up pretended payments to the Little Rock and Fort Smith Railroad Company for the stock they respectively own, and pretend that the same was paid for by Warren Fisher, Jr., in work, labor, and materials furnished to said company in the construction of the road; and said Atkins and Converse have, in their answers to the original and amended bills herein, and the said Huntington has, in his pleas to the same, set up such pretended payments, and claim that they were made under the 29th section of said company's charter. These alleged payments are the merest pretences, and have no foundation in fact. Complainants allege that it is true that the said company made a contract with Warren Fisher, Jr., by which said Fisher agreed to construct said company's railroad, and equip the same, from a point on the Arkansas river opposite the city of Little Rock to Fort Smith, in the state of Arkansas, the estimated length of which was one hundred and fifty-three miles; and on that basis, as regards length, the said company agreed to pay the said Fisher, for constructing and equipping its said road, the gross amount of all the first mortgage bonds of said company; second, all the land bonds of said company; third, all the state aid bonds to which said company should be entitled under the laws of the state of Arkansas; fourth, all the stock issued, and to be issued, by said company, with certain minor exceptions stated in said contract (which said contract was in writing, and duly executed); and in order to make the above agreement more specific,

said company further agreed with said Warren Fisher, Jr., that it would place a first mortgage upon said road and its appurtenances, and issue under the same. six per cent gold bonds to the amount of $3,500,000, and no more, and that said company would put a mortgage upon all the lands, from whatsoever source derived, and issue seven per cent bonds thereunder to the extent of $5,000,000, and no more, and that said company would procure from the state, from the proper authorities, state aid bonds to the amount of $1,500,000. And the said company further agreed that the capital stock should be $6,000,000, of which one-half should be preferred and the other common stock. That in A. D. 1869 said Fisher entered upon the construction of said road, under his said contract, and performed some work and furnished some material; but before his said contract was one-third completed he abandoned the same, and said company, by an order on its books, in 1871, declared said contract forfeited and at an end, by reason of said Fisher's failure to perform the same, since which nothing further has been done in further execution of said contract by the said Warren Fisher, Jr. That while said Fisher, Jr., was working on said road under his said contract, the said company paid and delivered to him all the first mortgage bonds of said company, amounting, as aforesaid, to $3,500,000, less, perhaps, about $100,000 of said bonds which were not then issued and all the land bonds aforesaid amounting to $5,000,000, less a small number (amount not known to complainants): also, about $800,000 of state aid bonds, issued by the state of Arkansas and delivered to said company. And the said Warren Fisher, Jr., the defendants, Atkins, Converse, Huntington, and other persons, who are now stockholders in said company, subscribed for all, or nearly all, the stock of said company, as aforesaid, and certificates for the same were issued to said several stockholders; the exact amount of stock so issued, and precisely how it was subscribed, the complainants are unable to state, for at that time the stock-books of the said company were kept in the city of Boston, in the state of Massachusetts, and the subscriptions for and issuance of stock were made there, under the supervision of an executive committee, and the complainants have never had access to said books, and they pray that the defendants may be compelled to produce the said original stock-book of said corporation in court. The complainants further aver that the bonds which the said Fisher, Jr., received, as aforesaid, were, at their fair market value at that time, greatly more than sufficient to pay for all the work done and materials furnished by the said Fisher, Jr., under said contract, or in any other manner, upon said railroad. And these plaintiffs are advised and believe, and so aver, that the capital stock of said company was and is a trust fund, and that the

bonds so paid to the said Fisher, Jr., or sufficient of them for that purpose, at their then fair and reasonable market value, should be applied to the payment of the work done for and materials furnished by said Fisher. Jr., to said company in the construction of its said road, whether under the contract or otherwise, and that no part of said work or materials should be applied as a payment or part payment of said stock, or as a payment or part payment of any portion thereof; and as said bonds were, at the time they were delivered to said Fisher, Jr., of value much more than sufficient to pay for said work and materials, and were a primary fund in the treasury of the said company, appropriated for that purpose, there has been no payment on said stock, or any portion of the same."

The plaintiffs then refer, for greater certainty, to the contract between said railroad company, and said Fisher, Jr., a copy of which they annexed to said amended bill of complaint, and pray that the same may be taken as a part thereof. The plaintiffs then allege "that the said contract between said railroad company and said Fisher, Jr., was not made under the said section 29 of the charter of said company, nor does said section authorize the making of any such contract. They aver that in the making of said contract there was no compliance with the provisions of said section, and there was no pretence or allegation in said contract, or in the rules of the said company in relation thereto, that said contract was intended to be made under said section. That the aforesaid stock was not subscribed under said section 29 of said charter, nor was the same subscribed payable in work or materials, nor was any bond taken by the said company to secure the faithful performance of any work or the furnishing of any materials, but, upon the contrary, said subscription, in whatever form the same was made, was a cash subscription, and the same has never been paid, in any manner, to said company by the said Fisher. Jr., or by the said defendants, or any of them, or by any other person or persons whomsoever. The complainants have not had access to the certificates of stock issued to the last-named defendants, and do not know whether they purport to be certificates for full-paid shares of stock, or of stock which is non-assessable; but, whatever may be the form of said certificates, the complainants aver that the stock they represent has never been paid for to said company, or for its benefit; and if the said certificates have been issued as full-paid stock, or as non-assessable stock, they have been so issued in fraud of the rights of creditors of said company, and so much of the said certificates as allege that the stock is full-paid, or not assessable, is void, and the certificates have no other or greater effect than if such void allegations had never been inserted therein." The counties of Conway,

Pope. Johnson, and Crawford are among the defendants who are alleged to be stockholders whose subscriptions have not been paid. The prayer in said second amended bill is for "process against said above-named defendants, requiring them to appear and answer the original and amended bills herein, and for the relief against them prayed for in said original and former amended bills. and for other proper relief."

The answers of said defendants. Atkins and Converse, to said second amended bill of complaint, deny that the allegations heretofore made by these defendants, that the stock which they, or either of them, owned or held in said company was issued as full-paid stock by said company, and in payment for work done and materials furnished, as alleged in their former answers, are mere pretences, and have no foundation in fact; and said defendants, in their said answers to said amended bill, reaffirm the allegations made by them in their said former answers upon this subject. Said defendants, in their said answers, admit that the copies of the contracts annexed to said second amended bill of complaint are substantially correct copies of said contracts between said railroad company and said Fisher, Jr.; that said Fisher, Jr., began work under said contract in the latter part of the year 1869 or in the early part of the year 1870; that all work under the same was suspended in the early part of the year 1871; that said company, in the latter part of the same year, declared said contract forfeited, and that no work has been done by the said Fisher, Jr., under said contracts since said contract was declared forfeited by said company. Said defendants, in their said answers, aver that. at the time when said work was suspended, as aforesaid, over fifty miles of said railroad had been completed by said Fisher, Jr., and accepted by said company; fifty additional miles had been graded and made ready for the iron, and a considerable amount of work had also been done upon the remaining line of said road; a large amount of iron rails had been purchased and delivered along the line of said road, to be laid thereon; a great number of ties had been cut, prepared. and delivered; a large number of locomotives, engines, cars, rolling stock, and equipments had been purchased and delivered, all under said contract between said railroad company and said Fisher, Jr., and in part compliance with the terms and conditions of said contract on his part to be performed; that a large amount of iron rails had also been purchased on account of said road and contract, but that the same were used by the aforementioned Josiah Caldwell in the construction of the Cairo and Fulton Railroad, for the building of which he at that time held the contract; and that after the contract between said Fisher, Jr., and said company had been terminated, as aforesaid, and before the aforesaid foreclosure proceedings were had, fifty additional miles of said road were fully completed by said defendants and other holders of the securities of said company. Said defendants, in their said answers. deny that said railroad company delivered to said Fisher, Jr., as many of the first mortgage and land grant bonds of said company as is alleged in said second amended bill of complaint, but admit that said company delivered to said Fisher, Jr., bonds of the state of Arkansas to the par or nominal value of $800,000. Said defendants deny, in their said answers, as they have denied in their former answers, that they, or either of them, ever subscribed to the capital stock of said company. They are informed and believe and aver that all the shares of stock of said company which they, or either of them, ever owned or held, were all issued in Boston, Massachusetts, to the said Fisher, Jr., by the orders and votes of the board of directors of said company, or of the executive committee of said board, residing in said state of Arkansas, under said contracts between said company and said Fisher, Jr., and upon estimates made by the chief engineer of said company. as provided in said contracts. They deny that any subscriptions to said stock were made in the said city of Boston. or elsewhere, outside of said state of Arkansas. Said defendants, in their said answers, aver that said company was duly authorized by the 17th and 29th sections of its said act of incorporation, and by the charter of said company and the laws of the state of Arkansas, to enter into said contracts, and to issue its capital stock in the manner provided in said contract, and that all the shares of capital stock which were issued to said Fisher, Jr., under said contracts, by the board of directors of said railroad company, or by the executive committee of said board, and that all the shares of stock of said company which these defendants, or either of them, now hold or ever held, were and are full-paid shares, and not liable or subject to assessment by said company, or upon the application of any creditor of said company, whether or not a bond was taken from said Fisher, Jr., to said company, with security, for the faithful performance of said work or furnishing said materials. Whether such bond was taken or not, said defendants are ignorant.

The Little Rock and Fort Smith Railroad Company was originally incorporated in 1853, under the general laws of the state of Arkansas; but by an act of the general assembly of said state approved January 22d, 1865, entitled "An act to incorporate the Little Rock and Fort Smith Railroad Company," the corporation theretofore existing under that name continued its existence under said act.

Abstract of charter:

The 1st section of said act provided "that the said corporation shall be composed of" certain persons whose names are mentioned,

"and such other persons, corporations, states, counties, and cities as may subscribe to stock in said company and comply with the provisions contained in this act, and also with the by-laws, rules, and regulations of said company, and the general law of the land respecting the same."

The 2d section fixes the termini of said road, and the 3d section contains the grant of powers, franchises, and privileges incident to corporations of that nature.

By section 4 of said act, "the capital stock of the company is fixed at $1,750,000, divided into seventy thousand shares of $25 each. A payment of five per cent on the amount of each share shall be made when the sum of $100,000 shall be subscribed. The subsequent payments shall be made in such sums and at such periods as shall be fixed by the board of directors: provided, that the call shall not be made for more than ten per cent at any one time, and that sixty days notice of each call shall be given by publications in one newspaper in the city of Little Rock, one in Fort Smith, and one in Van Buren, Arkansas, and not more than three calls shall be made in any one year."

By section 5, "the state of Arkansas and the several counties upon the line of this road, or elsewhere in this state, not only may become, but are solicited to become, stockholders in said company, by subscribing for stock therein; and in the event that any or either of them do so, they shall be represented in the directory in the manner hereinafter provided."

Section 6 provides that "the said corporation shall go into operation and be organized as soon as shares of stock to the amount of $100,000 shall have been subscribed."

The sections intervening between section 6 and section 15 have no bearing upon the issues in this cause, and relate principally to matters of detail in conducting the election of directors and in the appointment of commissioners to receive subscriptions to stock, which are required to be "returned to the domicile of the company, at Clarksville, and there recorded in the office of the recorder of deeds and mortgages of the county of Johnson, and otherwise disposed of as may be required by law."

Section 15 enacts that "in case of failure on the part of any subscriber to pay any installment on his stock when and as required, the amount due shall bear interest at the rate of ten per cent per annum from the time it falls due. The board of directors shall have the option, after thirty days written notice to the defaulter, to forfeit his stock and sell it at auction for the benefit and at the risk of said stockholder, and sue him for any deficit afterwards remaining, or to compel by suit the payment of such installment; and no stockholder shall be permitted to vote, personally or by proxy, for himself or as proxy for another, while in default."

Section 16 provides that "all meetings of stockholders shall be composed of persons or corporations, or the agents of corporations or persons, holding, in the aggregate, more than one-half of the stock of the company taken and subscribed for, in order to make valid and binding their action in the premises, except meetings called for the purpose of increasing or diminishing the capital stock of the company, at which three-fourths of the stock shall be represented. At elections more than one-half of the stock, exclusive of that taken by the state, shall be represented."

Section 17 enumerates at great length, and with much detail, the powers of the president and directors of said corporation, among which are the powers: "To do anything necessary for the construction, repair, and maintenance of the railroad hereinbefore mentioned, with as many tracks as they may deem necessary; to contract specially for work, labor, or materials to be furnished to the company, and agree whether the whole or any part thereof shall be payable in the capital stock of the company; to receive from the state or general government a grant of lands, or become the agent of either to dispose of lands granted, and with the same, or the aid of the same, to procure the road to be built; to make all contracts necessary thereto, and all contracts for the furnishing of iron, or other necessary equipment or supplies of the road, on such terms and credits as they think proper, including all locomotives, engines, cars, vehicles, teams, and other equipments, deemed by them necessary or useful to the purposes of the company; to borrow money for and on account of said road in any sums not to exceed $50,000, unless authorized by a vote of two-thirds of the stockholders, exclusive of the state, to exceed that sum, and to mortgage said road and its appurtenances to secure the same; to mortgage said road, or hypothecate its receipts, to pay persons who take contracts for building the same."

In and by said section 17, said directors are required to "make a report in full detail to the stockholders, upon the 1st days of June and December in each year, of the working of the road, and its expenses and profits, as also a detailed statement of all contracts during the process of constructing the road and its bridges, with an account of the progress made;" also, "to be kept a regular set of books, in which shall be entered, in the regular order of their several dates, all business or other transactions in the company, which books shall always be open to the inspection of any stockholder, at the office of the company, during the business hours of the day;" also, "to keep a stock-book, and certificates of stock shall be issued to the stockholders, and no transfer of stock shall be binding on the company until made on its stock-books."

By section 19: "The limitation as to the amount which the board of directors may borrow, does not apply to contracts upon credit for the furnishing of iron equipments, other

necessary supplies, or labor, or to a contract for the construction of the whole road, or a section thereof."

Section 21 provides that "no transfer of stock shall exempt the transferrer from the obligation of paying installments afterwards called for, until the whole fifty per cent on each of his shares shall have been paid."

"Sec. 24. The said company hereby reserves to itself the right either to accept or reject any act of the general assembly of this state, altering or amending this charter; which shall be decided by a vote of a majority of all the stock, exclusive of that taken by the state, at a meeting of the stockholders regularly convened for that purpose."

"Sec. 25. No stockholder in this company shall be, in any event, responsible for losses of the company to any greater amount or extent in the whole than the amount of stock subscribed for and taken by him."

"Sec. 29. The president and directors may, if they consider it expedient, receive subscriptions for stock, payable in labor or materials in and for the road, to be done and furnished under the superintendence of the directors of said company, or officers appointed by them, bond being taken to the company, with security, for the faithful performance of the work or furnishing of the materials. No director, treasurer, engineer, clerk, servant, or other officer of the company, shall be an undertaker or contractor of or for any work on said road."

"Sec. 31. This charter shall continue for the term of ninety-nine years; at the end whereof, the corporate privileges hereby granted shall cease and terminate."

Abstract of votes, also of the history of the corporation:

The counties of Conway. Pope, Johnson, and Crawford severally subscribed to the stock of said corporation to the aggregate amount of $52,000, and the state of Arkansas, under an act approved January 15th, 1861, invested the proceeds of the sales of certain swamp lands, amounting to $38,000, in the stock of the company, and full-paid certificates of stock for said amount were issued to said state. Prior to January 1st, 1868, the directors had made the following calls upon the stockholders on account of their subscriptions, viz.: November 9th, 1853, five per cent.; June 8th, 1854, one and one-half per cent.; December 23d, 1859, five per cent.; May 13th, 1860, five per cent. On the 2d of September, 1869, an additional call of ten per cent. was made, payable on or before December 15th, 1869. At a meeting of the stockholders held on the 2d day of December, 1869, it was voted that no further calls should be made upon the original stock subscriptions, but that certificates of stock should be issued to all those who had paid up the calls already made, and that the balance of their subscriptions should be cancelled. The directors were requested to carry this vote into effect. On January 25th, 1870, the directors instructed

the secretary to cancel seventy-three per cent. of the original individual and county subscriptions, "and to issue, under the direction of the president, certificates of stock to all stockholders whose accounts shall, on the 15th day of March next, show credits to the amount of twenty-seven (27) per centum of the stock now standing in their names." The directors also voted, at the same meeting, "that all stock which shall not, on the 15th day of March next, be credited with payments amounting to twenty-seven (27) per centum in the aggregate, shall be forfeited to the company, and shall be sold so far as paid to the highest bidder, for the benefit of the delinquent, as provided by the charter; and the secretary of the company is hereby directed to give legal notice of the same. and to carry into execution this resolution." And in December, 1870, the directors voted that it was "inexpedient for the company to attempt the further collection of calls upon the original individual and county subscriptions, and that the secretary cancel on the stock-books of the company such per centum of the subscriptions as now remain unpaid. and issue certificates of stock to each stockholder for the amount respectively paid—that is, one share of stock for each sum of $25 paid. the stockholder to lose the fraction or excess paid over a full share."

The treasurer of said company delivered to said Fisher, Jr., or on his account under said contracts. and by order of the board of directors of said company, seventy-four thousand shares of common stock and seventy-four thousand shares of preferred stock, all of the par value of $25 per share. These shares were delivered as follows, viz.: July 28th, 1870, 60,000 shares common stock. July 25th, 1870, 60,000 shares preferred stock. September 28th, 1870, 6,000 shares common stock. September 28th, 1870, 6,000 shares preferred stock. December 5th, 1870, 6,000 shares common stock. December 5th, 1870, 6,000 shares preferred stock. February 3d, 1871, 2,000 shares common stock. February 3d, 1871, 2,000 shares preferred stock. The votes of the directors of said company authorizing the issue and delivery of the above shares of stock were passed at various times, as follows, viz.: September 2d, 1869, a meeting of the board of directors was held. at which were present Messrs. A. J. Ward, D. E. Jones, C. C. Reid, Jr., E. Wheeler, D. H. Barnes, U. M. Rose, and James A. Martin.

On motion of Mr. Martin, the following resolution was adopted. without dissent, to-wit: "Resolved, That the secretary of this company be directed to issue to Warren Fisher, Jr., the assignee of DeWitt C. Wheeler, trustee. common stock of this company to the amount of thirty-five thousand dollars ($35,000), at par, on account of work done and materials furnished under the contract for the construction of the road of this company, previous to the 1st day of September. 1869." February 8th, 1870, at a meeting of

the board of directors, at which were present Messrs. C. G. Scott, U. M. Rose, James A. Martin, J. H. Haney, and E. Wheeler—a quorum—Mr. Rose offered the following resolution, which was unanimously adopted, viz.: "Resolved, That the consulting engineer of this company proceed, with the assistance of the chief engineer of the contractors, to make a detailed estimate of all work done and materials furnished by the said contractors in the construction and equipment of the said road, and report the same at the next meeting of the board, or as soon thereafter as possible." July 11th, 1870, a meeting of the directors was held, at which five directors were present—a legal quorum. (The record does not give their names.) Mr. J. H. Haney, consulting engineer, presented and filed his report and estimate of the amounts due to the contractors by the terms of the contract, and thereupon Mr. Rose offered the following resolutions, which were unanimously adopted, to-wit: "Resolved, That the president, in his discretion, be, and he is hereby, authorized to deliver to Warren Fisher, Jr., the sum of $787,500 in the first mortgage bonds of the company, and the sum of $1,125,000 in the land bonds of the company, and the sum of $675,000 in preferred stock of the company, and the sum of $675,000 in the common stock of the company; such being the estimate of J. H. Haney, Esq., consulting engineer of the company, of the amount now due him on his contract." "Resolved, That the president may, in his discretion, advance to said Warren Fisher, Jr., any greater amount of bonds or stock, upon his giving good and sufficient security as provided in said contract: provided, that the said Warren Fisher, Jr., shall also include in said security the excess of first mortgage bonds already delivered to him by way of advances to him: provided, further, that said Warren Fisher, Jr., shall first execute his power of attorney to the secretary of this company for the transfer of stock, as required by said contract." "Resolved, That the president be, and he is hereby, authorized to take the seal of the company with him to Boston, Massachusetts, and there to execute, sign, and deliver said bonds and stock in accordance with the terms of these resolutions."

November 15th, 1870, a meeting of the directors was held, at which were present John C. Pratt, president, and Messrs. Scott, Rose, Wheeler, Lawson, and Martin. The following resolution was unanimously adopted, viz.: "Resolved, That the executive committee shall have full power to deliver to Warren Fisher, Jr., the contractor, or his assigns, the stock and bonds of this road in such amounts and at such times as they may deem expedient." At various times between February 15th, 1870, and June 9th, 1871, the treasurer of said company also issued and delivered to the said Fisher, Jr., or on his account, by order of the board of directors, $3,340,000 first mortgage bonds, $4,441,000

land bonds, and $900,000 state aid bonds; of which $550,000 first mortgage bonds, and $950,000 land bonds, were issued as loans subsequently to December 22d, 1870. Of the bonds loaned, as aforesaid, only $55,000 first mortgage bonds, and $55,000 land bonds, were returned to said company.

The plaintiffs seek to hold the defendants, Atkins and Converse, liable to contribute to the satisfaction of their several judgments against the Little Rock and Fort Smith Railroad Company, upon two distinct and independent grounds, viz.: First. Because these defendants are the owners of certain unpaid shares of stock of said company. Second. Because, under the constitution of 1868 of the state of Arkansas, stockholders in corporations are not only liable for such amounts as remain unpaid upon the shares of stock by them owned, but "to a further sum equal in amount to such stock." The counties of Conway, Pope, Johnson, and Crawford, prior to 1869, had severally subscribed to the stock of the railroad company, paid twenty-seven per cent thereof, and rely upon the action of the stockholders of December 2d, 1869, and of the directors January 25th, 1870, heretofore mentioned, releasing them from further liability, and upon the statute of limitations of the state and the laches of complainants. The other necessary facts are stated in the opinion.

W. H. Winfield, B. F. Rice, M. L. Rice, and Mr. Thoroughman, for plaintiffs.

C. W. Huntington, for Atkins and Converse.

U. M. Rose, for certain other defendants.

Before DILLON, Circuit Judge, and CALDWELL, District Judge.

DILLON, Circuit Judge. It is not necessary to decide whether the company's contract with Warren Fisher, Jr., for the construction of the road, would have been held valid if it had been assailed by non-concurring shareholders or by the creditors of the company. A contract for the construction of the whole road seems, however, to have been contemplated as permissible by the 19th section of the company's charter; and the 17th and 29th sections contained express authority to receive subscriptions for stock, "payable in labor or materials in and for the road;" * * * "bond being taken to the company, with security, for the faithful performance of the work or furnishing of the materials." But it is not necessary to pass upon the validity of the Fisher contract, for the reason that the complainants' bills do not attack it either as being fraudulent or ultra vires. Nor has it been assailed in argument on either of these grounds, or on any ground, by the learned counsel for the complainants. In these causes the validity of that contract, so far as it authorized the issue of stock in payment for work done by Fisher, must, there-

fore, be assumed. Stock was thus issued, purporting to be full-paid stock.

On September 2d, 1869, the directors of the company ordered the secretary to issue $35,000 in the common stock of the company, at par, "on account of work done and materials furnished under the contract for the construction of the road, previous to September 1st, 1869."

On February 8th, 1870, the engineers of the company were instructed, by the unanimous vote of the directors, to make a detailed estimate of all work done and materials furnished by Fisher, and report; and in July, 1870, the report having been made, the directors unanimously authorized the delivery to Fisher of $787,500 first mortgage bonds, $1,125,000 land grant bonds, $675,000 in the preferred stock, and $675,000 in the common stock of the company; "such being the estimate of the consulting engineer of the company of the amount now due him on his contract." It was also resolved, at the same meeting, "that the president might, in his discretion, advance to Fisher any greater amount of bonds or stock, upon his giving good and sufficient security under his contract."

On November 15th, 1870, the directors authorized the executive committee to issue to Fisher "stock and bonds of this road in such amounts and at such times as they may deem expedient." Some stock was advanced, under authority thus conferred, without security being required; but this latter fact does not appear on the records of the company. The stock earned under the contract, and that issued in advance of being earned, was in the same form, and alike purported to be paid-up stock.

The defendants, Atkins and Converse, never made an original subscription to the stock of the company, and they became holders of its shares by the purchase of the same in Boston, through brokers in the market, without any actual knowledge of the facts connected with its issue. The shares thus purchased by the defendants, Atkins and Converse, were shares which had been issued to Fisher by the company, under the resolutions and circumstances hereinbefore set forth; but whether these shares were shares which had been fully earned by Fisher, or shares which had been advanced to him in anticipation of work to be done, does not appear, nor is it possible, as counsel concede, ever to ascertain.

The ground of liability on the part of the defendants, Atkins and Converse, is that, in point of fact, none of the shares issued to Fisher were ever paid for; that he had received in bonds more in value than the work he performed under his contract was worth; that, not having complied with his contract, his agreement, contained in his construction contract with the company, to take the shares, must now be regarded and treated as an agreement to pay for the shares in cash; and

that shares, not being negotiable in the sense of the law merchant, are open, in the hands of every holder, to all the equities which attach to them in the hands of the original taker; and, therefore, since Fisher, if he held the shares, could be compelled to pay for them by the company, or, at all events, by its creditors, the present holders of such shares, although they are holders for value, and without actual notice of the equities in respect thereto as between Fisher and the company, are necessarily charged with the obligations which attach to the original subscriber or holder of the shares.

There is no allegation in the bills of complaint that the defendants, Atkins and Converse, were in any way interested in, or parties to, the contracts under which said shares of stock were issued, or that they had any knowledge of such contracts when they purchased their shares of stock. Neither is there any allegation in the bills of complaint that said defendants were parties or privies to any over-issue or over-payment of bonds or stock by said company to Fisher, Jr., or that the defendants had any knowledge or information that such alleged over-issues or over-payments had been made. Neither is there any allegation that the defendants had any knowledge or information that the shares of stock owned by them had not been paid for in full, or that they had any knowledge or information that their certificates of stock were issued in fraud of the rights of creditors.

Upon the allegations of the plaintiffs' bills, as well as upon the proofs, these defendants are to be treated as the bona fide purchasers and holders of the shares of stock by them severally owned.

The plaintiffs nowhere allege, indeed, that any shares of stock were issued to said Fisher, Jr., by said corporation, otherwise than in accordance with the terms of said contract, or that any shares were issued in excess of the stipulations of said contract.

It is our judgment, especially in view of the provisions of sections 17, 19, and 29 of the company's charter, before adverted to, that shares of stock issued as full-paid shares by authority of the board of directors, under the construction contract, which was never questioned by the company or its shareholders or creditors, and which is not assailed or impeached by the pleadings in the cause, and sold by the contractor as full-paid shares, to purchasers for value, without actual notice of the equities between the contractor and the company, if any there be, cannot be held subject to such equities, and to a liability to have shares thus issued and thus purchased treated as unpaid stock. No case holding such a doctrine was referred to by the learned counsel for the complainants, and it is confidently believed that no such judgment has ever been pronounced. It is difficult to perceive any principle of reason or law on which such a judgment could rest. The com-

pany have the power to issue its shares. It cannot, without special authority from the legislature, issue its shares as full-paid without actual payment in money, or, at least, in money's worth. A leading object of the creation of corporations and the issue of shares is that the shares may be transferred with all practicable facility. Bank v. Lanier, 11 Wall. [78 U. S.] 369; New York, etc., R. Co. v. Schuyler, 34 N. Y. 30, 82.

The company's directors and officers are the guardians of the company's rights. They ought not to issue shares in violation of their duty. They know whether the shares have been paid for or not. This the public have no means of knowing, and no effectual means for ascertaining. If the company's directors, or other authorized officers, commit a fraud upon the company in this respect, they are undoubtedly liable therefor. But can any one point out wherein the equities of the creditor of a company thus defrauded by its officers is superior to the equities of those who have acted upon the representations of such officers within the scope of their powers, accredited by resolutions of the directors and authenticated by the corporate seal, and upon such solemn assurances purchased the shares of the company? Grant that the capital stock is a trust fund for the benefit of creditors, yet this trust cannot be followed, any more than other trusts, into the hands of bona fide purchasers for value. Per Swayne, J., in Sanger v. Upton, 91 U. S. 56, 60.

What contract did the defendants Atkins and Converse make? They made a contract to buy, and did buy, what the company had issued and represented to be full-paid shares, without notice that this representation was untrue. If the representation thus made is true, they are under no liability again to pay for the shares. If the shares had been represented to have been unpaid, non constat that they would have purchased them. Clearly the company would be estopped to make the claim here advanced by its creditors.

Again, we ask, in what consists the superior equity of the creditor over the obvious equities which exist in favor of such a purchaser of the company's shares? The creditor trusted that the company's officers would not violate their duty; the purchaser trusted that they had not violated their duty.

The rights and obligations of a bona fide transferee of shares purporting to be full-paid shares are different from the rights and obligations of the transferee of shares which do not purport to be full-paid. In cases where the certificates show on their face that the shares have been paid in part only, the law implies a promise by the transferee to pay the balance due upon the shares upon calls when he has come into privity with the company. Webster v. Upton, 91 U. S. 65, 69; Upton v. Tribilcock, Id. 45. Such an implied promise rests upon the reasonable and obvious ground that the transferee has knowingly and voluntarily assumed the liability of the transferrer. But upon what ground can the law raise a promise to pay the balance due upon shares when the company has asserted, and the purchaser acts upon the assurance, that the shares have been fully paid?

The question here raised by the complainants is settled by the universal practice of business men, as well as by the judgments of the courts. Millions of dollars of stocks are sold in this country every week, and there is no practice on the part of purchasers and no understanding that the law requires of them that they shall ascertain aliunde the representations of the company's authorized officers that certificates of full-paid stock have in fact been fully paid. How could a purchaser ascertain this fact? Must he go to the records of the particular corporation, in a remote and distant state it may be, and make an examination before he can safely buy? What more value is to be placed upon facts stated in the records than upon those stated under the corporate seal, by the authorized officers, as respects matters infra vires? Officers who would state a falsehood on the certificate of stock would state it on the corporate records, if this were necessary to make the intended fraud effectual. And, hence, the duty so much insisted on in argument, that a purchaser is bound to know the facts appearing on the corporate records, in addition to its being an impracticable duty, would, if discharged, be valueless as a guaranty against frauds upon creditors. Besides, on what principle is it that a purchaser of the company's shares is to be held to be the guardian of the rights of the company's creditors and bound to protect them? But the exigencies of this case do not require us to go so far, since, if we concede that a bona fide transferee for value of full-paid shares is charged with knowledge of all the facts concerning those shares appearing on the records of the corporation, there is nothing therein disclosed which shows that the shares purchased by Atkins and Converse had not been paid for by Fisher under his contract. The company's records show that a large amount of stock had been earned by Fisher and ordered to be issued, and under the 29th section of the charter other stock was ordered to be advanced to him, on his giving bond to the company to pay for the same under his construction contract, the validity of which was not questioned by the company or any of its shareholders.

But the question here presented does not rest alone upon general reasoning. The subject was somewhat considered by the circuit court for the Eastern district of Missouri, in Phelan v. Hazard [Case No. 11,068]. That was a suit brought by a single creditor of an insolvent corporation to enforce the liability of a stockholder for the unpaid balance of his stock. The shares had been issued in payment for a mining property which the corporation had purchased. The plaintiff did not undertake to impeach as fraudulent this

transaction between the corporation and the original shareholders, but simply claimed that the shares of stock had not been paid for, either by the person to whom they were originally issued or by the defendant, the transferee and present holder of the shares. The court, after stating that the proof showed that the shares in question had been paid for precisely as they were originally agreed to be paid for, viz., by a conveyance of the mining property of the corporation, and that the conveyance had been received and recorded by the corporation, says: "Unless this agreement is rescinded or set aside for fraud, how can it be said that the stock has not been paid for? The parties have agreed that it has been paid for, and that agreement is conclusive, unless it is rescinded or impeached for fraud, and this cannot be done unless the attack is directly made. Undoubtedly such an attack could be made while the stock was in the hands of the original takers of it; but it is not so clear that it could be made by a subsequent creditor of the corporation against a transferee of the stock for value, who purchased the same in good faith as full-paid stock, relying upon the records of the corporation, which showed the shares to have been fully paid for, and the manner in which the payment had been made."

Subsequently the similar case of Foreman v. Bigelow [Case No. 4,934] came before the circuit court for Massachusetts, and it was decided that a bona fide purchaser of full-paid shares was not liable to be assessed upon his shares. The opinion of Mr. Justice Clifford is very full, and we forbear going over ground so exhaustively covered in his judgment.

A long line of English cases under the companies acts, referred to in the opinions in the two American cases last cited, had established the principle that stock need not necessarily be paid for in cash—that it might be paid for in money's worth. This doctrine had led to such abuses as to cause parliament to insert in the companies act of 1867 the following provision:

"Sec. 25. Every share in any company shall be deemed and taken to have been issued and to be held subject to the payment of the whole amount thereof in cash, unless the same shall have been otherwise determined by a contract duly made in writing and filed with the registrar of joint stock companies at or before the issue of such shares."

The construction and effect of this section came before the court in Nicolls' Case [In re British Farmers' Pure Linseed Cake Co.], 7 Ch. Div. 533. In that case a company issued certificates of shares as fully paid up, when in fact no payment had been made, nor contract registered, under the provisions of the companies act of 1867, (section 25). At the date of the winding up of the company, some of these shares were held by N., who had no notice that they were not fully paid up. It was held (reversing the decision of Hall, vice-

chancellor) that by the issue of the certificates the company were estopped from alleging that the shares were not paid up, and that N. could not be placed on the list of contributors in respect of them as unpaid shares.

An appeal was taken by the liquidator, and the appeal was dismissed by the house of lords. 26 Wkly. Rep. 819. In giving judgment, Lord Cairns, after quoting the aforementioned section 25 of the act of 1867, said: "The effect of the section is very simple. Before the passing of the act it was open to any holder of shares to say, 'I have made a contract that I shall not be called on to pay up the value of these shares;' but the abuse of such contracts led to a statutory provision, making it a condition that no shares be treated as fully paid unless their value is paid in cash, or unless publicity is insured by a written contract duly filed in the manner provided for. If Goulton had been called upon to pay up the value of his shares, this section would have deprived him of any defence; but we have now to consider the case of a bona fide transfer for value, and I want to know how the section can affect such a transaction. It leaves untouched the question of payment, and says nothing as to evidence of payment; but if the company gives a receipt for the amount of the shares, and this receipt passes to a purchaser who does not know that no actual payment has been made, his title must not be prejudiced by the statute. He receives a representation to the effect that the law has been complied with, and it would paralyze the whole trade in companies' shares if a person taking shares with a representation that they are fully paid up must disregard this assertion and satisfy himself of the fact by personal inquiry, especially as he might have considerable difficulty in obtaining accurate information as to the fact of payment or non-payment. Much was said as to the burden of proof and as to the necessity for showing in an absence of notice. If the shares come, in the regular course of business, into the hands of a purchaser for valuable consideration, those who challenge the transaction must prove that such purchaser had notice of the fact." Lords Hatherley, Selbourne, and Blackburn each gave opinions in concurrence, and Lord Gordon concurred without delivering a separate opinion.

As to other defendants, different questions are presented. Certain individuals and counties became original subscribers to the stock of the company. By the charter of the company it is provided that five per cent on each share shall be paid when subscribed, and subsequent payments shall be made upon calls by the board of directors, who are, however, required to give sixty days notice of each call, and are prohibited from making a call for more than ten per cent at any one time, and from making more than three calls in any one year. On December 2d, 1869, the stockholders voted that no further calls be made upon the original stock subscriptions, and that certifi-

cates issue for stock to the extent to which the payment had been made, and that the balance of the subscriptions be cancelled; and on January 25th, 1870, the directors, pursuant to the above-mentioned vote of the stockholders, instructed the secretary "to cancel seventy-three per cent of the original individual and county subscriptions, and to issue certificates of stock to all stockholders whose accounts shall, on March 15th, 1870, show credits to the amount of twenty-seven per centum of the stock now standing in their names." As respects certain individuals and counties made defendants, this was carried out.

The case as to the counties was submitted upon the bill and answers. The averments of the answers are to be taken as true. The counties had paid twenty-seven per cent of their subscriptions. The release was directed by the stockholders themselves. The company was then solvent. The release was made a matter of record in 1870. There was no secrecy and no fraud intended. It is averred in the answers that the original subscriptions had been made before there was any legislative authority for that purpose. The company decided in 1870 that it was "inexpedient to attempt the further collection of calls upon the original individual and county subscriptions to the capital stock," and ordered one share of $25 to issue for each $25 paid, "the stockholders to lose the fraction paid over a full share." This arrangement, it may fairly be inferred, was consented to by every person interested in the company. The amount of the old stock was thus ascertained, and the company had agreed to give the balance of its stock to the contractor for building its road, and undoubtedly the contractor knew of this arrangement and consented to it. The counties and the company acted on the faith of this release. The counties supposed they were out of the company, and subsequently had no voice and took no part in its affairs. No stockholder in the company ever complained of the action in releasing the counties. No creditors are in existence who were such at the time of the release of the counties, except those claiming under the Fisher contract; and no claim was made against the counties that they were liable as stockholders until 1877, nearly seven years after they were released, and long after the company was bankrupt and practically dissolved. Under the circumstances of the case as set forth in the answers of the counties, we are of opinion that the release was effectual; but if it is not, the counties ought to be protected by the creditors' laches from the liability which, at this late day, the creditors are now seeking to enforce against them.

In disposing of the case it may be well briefly to express our views concerning the claim of the creditor based upon the double liability clause of the constitution of 1868. The charter of the railroad company contained this provision:

"Sec. 25. No stockholder in this company shall be in any event responsible for losses of the company to any greater amount or extent in the whole than the amount of stock subscribed for and taken by him."

Section 24 of the charter of the company was as follows: "The said company hereby reserves to itself the right either to accept or reject any act of the general assembly of this state, altering or amending this charter; which shall be decided by a vote of a majority of all the stock, exclusive of that taken by the state, at a meeting of the stockholders regularly convened for that purpose."

Afterwards the constitution of 1868 was adopted, containing the following: "The general assembly shall pass no special act conferring corporate powers. Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed. Dues from corporations shall be secured by such individual liability of the stockholders and other means as may be prescribed by law; but, in all cases, each stockholder shall be liable, over and above the stock by him or her owned, and any amount unpaid thereon, to a further sum at least equal in amount to such stock. The property of corporations now existing or hereafter created shall forever be subject to taxation, the same as the property of individuals. No right of way shall be appropriated to the use of any corporation until full compensation therefor shall be first made in money, or first secured by a deposit of money, to the owner, irrespective of any benefit from any improvement proposed by such corporation; which compensation shall be ascertained by a jury of twelve men, in a court of record, as shall be prescribed by law."

The provisions of the constitution were never accepted by the stockholders.

As respects the claim in the bill based upon the double liability clause of the constitution of 1868, we remain of the opinion heretofore expressed, that the measure of liability of the stockholders, at whatever time they become such, is fixed by the 25th section of the charter, and was not increased by any act of the state not assented to by the corporation.

The purpose of the provision in section 25 of the charter was not to declare a double liability, but to limit the liability of the stockholder to the duty of paying for the stock subscribed or held by him. The state has passed no act, so far as relates to the liability here sought to be enforced, to carry the constitutional provision into effect.

The defendants contend that the constitutional convention of 1868 did not intend to legislate upon this subject of the personal liability of stockholders in corporations, but to leave the whole subject to future legislatures, with a limitation upon their powers, which limitation was fixed by the clause in question; and that the sole object and purpose of such clause is to declare the limita-

tion, and not to create the liability. It cannot be denied that there are strong arguments in favor of this view.

If the constitutional provision is not self-executing, the same result is reached as that based upon sections 24 and 25 of the charter. Bill dismissed.

[See Atkins v. Steacy, Case No. 605, published in 5 Dill. 387, as a note to this case.]